1

2

3

4

5

6

7      **UNITED STATES DISTRICT COURT**

8      **SOUTHERN DISTRICT OF CALIFORNIA**

9

10   VALVOLINE INSTANT OIL CHANGE          CASE NO. 12-cv-2079-GPC-KSC
     FRANCHISING, INC.; ASHLAND
11   CONSUMER MARKETS, a commercial
     unit of ASHLAND, INC.; ASHLAND
12   LICENSING AND INTELLECTUAL
     PROPERTY LLC; HENLEY
13   ENTERPRISES, INC.; HENLEY PACIFIC      **ORDER DENYING**
     LLC; HENLEY PACIFIC LA LLC; and        **PLAINTIFFS VIOCF AND**
14   HENLEY PACIFIC SD LLC,                 **ASHLAND'S MOTION FOR**
                                            **PARTIAL SUMMARY**
15                          Plaintiffs,     **JUDGMENT; AND DENYING**
                                            **COUNTER DEFENDANTS**
16          vs.                             **VIOCF, ASHLAND AND**
                                            **ALIP'S MOTION FOR**
17   RFG OIL, INC.,                         **SUMMARY JUDGMENT ON**
                                            **RFG'S COUNTERCLAIMS**
18                          Defendant,

19   _____   [Dkt. No. 87.]

20   RFG OIL, INC.,
                            Counter-Claimant,
21
            vs.
22
     VALVOLINE INSTANT OIL CHANGE
23   FRANCHISING, INC.; ASHLAND
     CONSUMER MARKETS, a commercial
24   unit of ASHLAND, INC.; ASHLAND
     LICENSING AND INTELLECTUAL
25   PROPERTY LLC; HENLEY
     ENTERPRISES, INC.; HENLEY PACIFIC
26   LLC; HENLEY PACIFIC LA LLC; and
     HENLEY PACIFIC SD LLC,
27
                            Counter-Defendants.
28

Before the Court are Plaintiffs Valvoline Instant Oil Change Franchising, Inc. ("VIOCF"), and Ashland Consumer Markets' ("Ashland") motion for partial summary judgment on the fifth count for declaratory judgment that Ashland properly terminated the We Feature Agreement, and the sixth count for declaratory judgment that the Valvoline Group Agreements[1] are terminated; and Counter Defendants VIOCF, Ashland, and Ashland Licensing and Intellectual Property LLC's ("ALIP") motion for summary judgment on the counterclaims alleged against them.  Defendant filed an opposition on April 25, 2014.  (Dkt. No. 93.)  A reply was filed on May 9, 2014.  (Dkt. No. 94.)  Based on the briefs, supporting documentation, and the applicable law, the Court DENIES Plaintiffs VIOCF and Ashland's motion for partial summary judgment and DENIES Counter Defendants VIOCF, Ashland and ALIP's motion for summary judgment on the claims again them in the first amended counterclaim.

## Procedural Background

Plaintiffs Valvoline Instant Oil Change Franchising, Inc. ("VIOCF"), Ashland Consumer Markets, a commercial unit of Ashland, Inc. ("Ashland")[2], Ashland Licensing and Intellectual Property LLC ("ALIP"), Henley Enterprises, Inc., Henley Pacific, LLC, Henley Pacific LA LLC, and Henley Pacific SD LLC filed a complaint against Defendant RFG Oil, Inc. ("RFG") on February 8, 2012 in the United States District Court for the Eastern District of Kentucky, which was transferred to this Court on August 22, 2012 pursuant to 28 U.S.C. § 1404(a).  (Dkt. No. 42.)  On September 5, 2012, RFG filed a counterclaim against all Plaintiffs.  (Dkt. No. 47.)  On October 10, 2012, Plaintiffs filed a first amended complaint.  (Dkt. No. 59.)  The First Amended Complaint alleges: (1) trademark infringement of the WeFeature marks; (2) trademark infringment of the VIOCF marks; (3) unfair competition in violation of 15 U.S.C. §

---

[1]These constitute the Licensing Supply Agreement and the Renewal License Agreement.

[2]Ashland is otherwise known as "Valvoline" and does business as "Valvoline Instant Oil Change."

1125(a); (4) violation of California Business & Professions Code section 17200; (5) declaratory judgement that the We Feature Agreement is terminated; (6) declaratory judgment that the Valvoline Group Agreements are terminated; (7) breach of contract for liquidated damages; (8) breach of contract for compensatory damages; (9) tortious interference as to Ashland and VIOCF; (10) tortious interference as to Henley; and (11) injunctive relief.  (Id.)   On October 11, 2012, the case was transferred to the undersigned judge.  (Dkt. No. 60.)

On August 5, 2013, the Court granted in part and denied in part Counter-Defendant's motion to dismiss RFG's counterclaim with leave to amend.  (Dkt. No. 74.) On August 26, 2013, RFG filed a first amended counterclaim.  (Dkt. No. 75.)  In the first amended counterclaim, RFG alleges: (1) breach of contract as to VIOCF, Ashland, and ALIP; (2) declaratory relief as to VIOCF, Ashland, and ALIP that the Valvoline Agreements are enforceable; (3) declaratory relief as to VIOCF, Ashland, and ALIP that the We Feature Agreement was never enforceable; (4) intentional interference with prospective economic advantage as to VIOCF, Ashland, and ALIP; (5) fraudulent misrepresentation as to VIOCF, Ashland, and ALIP; (6) misappropriation of trade secret as to VIOCF, Ashland, and ALIP; (7) intentional interference with prospective economic advantage as to Henley; and (8) breach of confidence as to Henley.  (Dkt. No. 75.)

Plaintiffs VIOCF and Ashland filed a motion for partial summary judgment on the fifth count for declaratory judgment that Ashland properly terminated the We Feature Agreement, and the sixth count for declaratory judgment that the Valvoline Group Agreements are terminated.  (Dkt. No. 87.)  Counter Defendants VIOCF, Ashland, and ALIP also moved for summary judgment on the counterclaims asserted against them.  (Id.)

## Factual Background

The following are the undisputed facts.  Plaintiffs and RFG were engaged in a franchisor/franchisee relationship for over 20 years where RFG branded its 44 oil

change facilities with Valvoline trademarks and purchased Valvoline branded products. Each facility was governed by virtually identical sets of franchise agreements. (Dkt. No. 88, McKeown Decl., Exs. A, B.) The relevant agreements are the Licensee Supply Agreement between Ashland Consumer Markets and RFG; and the Renewal License Agreement between Valvoline Instant Oil Change Franchising, Inc. and RFG. (Id.) Pursuant to the Renewal License Agreement, VIOCF promised not to grant a license to another Valvoline franchisee within a two mile radius of the store to which the License Agreement pertained. (Id., Ex. B., Renewal License Agreement § 1.3.)

From November 17, 2010 to November 24, 2010, RFG placed product orders that resulted in invoices totaling $387,738.32. (Dkt. No. 87-4, Nolan Decl. ¶ 3, Ex. A.) Then between November 29, 2010 through December 22, 2010, RFG placed additional product orders with an invoice of $118,415.35. (Id.) At that time, RFG was on a "Net 45-day" payment term which means that payments of orders are due on average 45 days after they are placed. (Id. ¶ 4.) Any products invoiced on or before the 25th of every month would be due the following month on the 25th. (Id.; Dkt. No. 93-2, Gong Decl. ¶ 13.) As applied to RFG's invoices, orders placed from November 17-24, 2010 totaling $387,738.32 were due by December 25, 2010 and orders placed from November 29-December 22, 2010 totaling $118,415.34 were due on January 25, 2011. (Dkt. No. 87-4, Nolan Decl. ¶ 4.) It is undisputed that RFG did not make full payment of the amounts due on December 25, 2010. (Dkt. No. 93-2, Gong Decl. ¶ 20; Dkt. No. 84-4, Nolan Decl. ¶ 5.)

Consequently, on January 28, 2011, Plaintiffs issued a "Notice of Default and Potential Termination" letter to RFG. (Dkt. No. 88, McKeown Decl., Ex. C.) Without waiving any of its rights, VIOCF granted RFG additional time to cure its breaches by providing payment extensions, and other opportunities to cure. (Id. ¶ 7; Dkt. No. 93-3, Lea Decl., Exs. 6, 7.) Then on November 30, 2011, VIOCF sent RFG a Confirmation of Termination Notice, which was later revised on December 5, 2011. (Dkt. No. 88, McKeown Decl. ¶ 8, Exs. D, E.)

The Revised Confirmation of Termination terminated the license agreements effective November 30, 2011 and sought damages under the contract totaling over $14,610,680.10. (Id., Ex. D.) However, Plaintiffs were willing to settle the matter and temporarily forego enforcement remedies, as well as forego early termination fees if RFG entered into a new "We Feature" Agreement and the required attached General Release. (Id., Exs. D, F.) Under the We Feature agreement, RFG would continue to operate its various locations and would continue to sell exclusively Valvoline products, but would de-brand its facilities and no longer be required to pay royalties and other fees associated with being a franchisee. (Dkt. No. 88, McKeown Decl. ¶ 9.) RFG was required to buy specified products from Valvoline and "not sell any bulk products which are not Valvoline brand bulk products." (Id., Ex. F. § 4.) It also required RFG to "not alter in composition, commingle with products from other sources, or otherwise adulterate the Products." (Id., Ex. F § 8.) On February 8, 2012, Plaintiffs sent Defendant a Notice of Termination of the We Feature National Account Sales Agreement. (Id., Ex. J.) The parties present different factual versions of the reasons for termination. (Id., Ex. J; Dkt. No. 93-2, Gong Decl. ¶¶ 38-39.)[3]

---

[3]Defendant also presents facts surrounding the establishment of Henley Enterprises, Inc. as a replacement of RFG as Plaintiffs' franchise relationship to demonstrate Plaintiffs' improper attempt to terminate the Agreements. Henley is Plaintiffs' largest franchisee in the East Coast, Florida and the Midwest. Henley looked into expanding its business into the southern California market that was occupied by RFG. During the early 2000's to 2010, RFG and Henley discussed a joint venture but no deal was ever realized. Then Henley became interested in purchasing 72 EZ-Lube store locations in southern California that emerged from bankruptcy for conversion into VIOCF franchises. At least 14 of the EZ Lube locations were within a two mile radius of RFG's VIOCF locations. According to RFG, in order for Henley to become a franchisee of VIOCF, Plaintiffs and Henley would need to find a way to terminate RFG's license agreement with Plaintiffs. By late 2011, the EZ Lube acquisition negotiations progressed and was close to signing a purchase agreement. In December 2011, Plaintiffs represented to Henley that RFG had entered into a We Feature Agreement and Henley signed the purchase agreement with EZ Lube on or about December 15, 2011. In December 2011 and January 2012, RFG continued negotiations as normal with Henley. In January 2012, RFG learned of Henley's impending deal to close on the 72 EZ Lub locations and it became clear that Henley did not have an intention to acquire RFG's locations. RFG also learned that Henley had been told that RFG's licenses were terminated and RFG was operating a We Feature Agreement. So on February 6, 2012, RFG advised Plaintiffs and Henley that it disputed the termination of its license agreements, it retained all substantial rights as

1    **II.    Legal Standard for Federal Rule of Civil Procedure 56**

2           Federal Rule of Civil Procedure 56 empowers the Court to enter summary

3    judgment on factually unsupported claims or defenses, and thereby "secure the just,

4    speedy and inexpensive determination of every action. " Celotex Corp. v. Catrett, 477

5    U.S. 317, 325, 327 (1986).   Summary judgment is appropriate if the "pleadings,

6    depositions, answers to interrogatories, and admissions on file, together with the

7    affidavits, if any, show that there is no genuine issue as to any material fact and that the

8    moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact

9    is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc.,

10   477 U.S. 242, 248 (1986).

11          An issue is "genuine" if sufficient evidence exists such that a reasonable fact

12   finder could find for the non-moving party. Villiarimo v. Aloha Island Air, Inc., 281

13   F.3d 1054, 1061 (9th Cir. 2002).   Initially, the moving party bears the burden of

14   proving there is no genuine issue of material fact. Leisek v. Brightwood Corp., 278

15   F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden

16   shifts to the non-moving party to produce evidence that a genuine issue of material fact

17   remains for trial. Id. In making this determination, the court must "view[] the evidence

18   in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871,

19   876 (9th Cir. 2001).  The Court does not engage in credibility determinations, weighing

20   of evidence, or drawing of legitimate inferences from the facts; these functions are for

21   the trier of fact. Anderson, 477 U.S. at 255.

22   **A.    Declaratory Judgment that the Valvoline Group Agreements are**

23   **       Terminated**

24   _____

25   a franchisee and those rights would be violated by the acquisition of the EZ Lube
     locations.   Consequently, Ashland and Henley filed this action on February 8, 2011.
26   Plaintiffs do not present any facts to dispute these allegations and argue that these facts
     are not relevant.   The Court agrees.   While these facts may have a bearing on the
27   underlying reasons for Plaintiffs' and Henley's actions, and other causes of action in
     the first amended counterclaim, Defendant has not presented any legal theory or
28   authority that these facts are relevant to a determination of the two causes of action at
     issue.

1  Plaintiffs seek summary judgment on their sixth cause of action for declaratory

2  judgment that the Valvoline Group Agreements are terminated.  Defendant opposes

3  arguing that the Agreements were improperly terminated.

4  The Declaratory Judgment Act[4] ("DJA") provides that, "[i]n a case of actual

5  controversy within its jurisdiction . . . any court of the United States, upon the filing

6  of an appropriate pleading, may declare the rights and other legal relations of any

7  interested party seeking such declaration, whether or not further relief is or could be

8  sought."  28 U.S.C. § 2201.  "A declaratory judgment offers a means by which rights

9  and obligations may be adjudicated in cases 'brought by any interested party' involving

10  an actual controversy that has not reached a stage at which either party may seek a

11  coercive remedy and in cases where a party who could sue for coercive relief has not

12  yet done so."  Seattle Audubon Soc. v. Moseley, 80 F.3d 1401, 1405 (9th Cir. 1996).

13  A declaratory judgment claim cannot stand in the absence of an underlying

14  substantive cause of action.  Union Station Assocs., LLC v. Puget Sound Energy, Inc.,

15  238 F. Supp. 2d 1226, 1230 (W.D. Wash. 2002) ("Union has asserted two claims for

16  federal declaratory relief, one under CERCLA § 113(g)(2) and the other under the

17  Declaratory Judgment Act, 28 U.S.C. § 2201. [However,] neither [claim] can stand in

18  the absence of a substantive cause of action.") (citations omitted).  Thus, a "claim" for

19  declaratory relief does not by itself state a claim.  See Audette v. Int'l Longshoremen's

20  & Warehousemen's Union, 195 F.3d 1107, 1111 n.2 (9th Cir. 1999) (excluding cause

21  of action for "declaratory judgment" because it merely sought relief rather than stating

22  a claim); Realty Experts Inc. v. RE Realty Experts, Inc., No. 11cv1546 JLS(CAB),

23

24  _____

25  [4]The first amended complaint is not clear whether Plaintiffs are moving under the Declaratory Judgement Act under federal law or declaratory relief under California Code of Civil Procedure section 1060.  Since the First  Amended Complaint uses the

26  term, "Declaratory Judgment" the Court applies federal law.  See e.g., Smith v. Bioworks, Inc., No. Civ. S-05-1650 FCD EFB, 2007 WL 273948 at 4 n. 5 (E.D. Cal.

27  Jan. 29, 2007) (complaint generally alleges a claim for declaratory relief and because it is a diversity action and plaintiff alleges California law, court applied California's

28  declaratory relief statute).

1  2012 WL 699512, at *2 (S.D. Cal. Mar. 1, 2012).

2        In this case, Plaintiffs have not articulated an underlying substantive cause of

3  action.  Based on the allegations in the first amended complaint, it appears the

4  declaratory judgment claim is based on a breach of contract cause of action.  In order

5  for Plaintiffs to be entitled to terminate the franchise agreements, Defendant must have

6  breached the agreements.  Accordingly, the Court must look at the elements of a breach

7  of contract cause of action.

8        In a breach of contract cause of action, a plaintiff must demonstrate: "(1) the

9  existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3)

10  defendant's breach, and (4) damage to plaintiff as a result of defendant's breach."

11  Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes, 191 Cal. App.

12  4th 435, 463 (2011).[5]  The parties raise issues as to Defendant's breach and Plaintiffs'

13  nonperformance.

14        A determination of these issues require a review of the relevant contract

15  provisions.  Paragraphs 3(b) and (c) of the Licensee Supply Agreement provides:

16       b. All payments for products due hereunder shall be made to Valvoline
         by Buyer without retention or set off. Credit terms, if any, extended to
17       Buyer shall be those established from time to time by Valvoline in its
         sole discretion . . . Such payments shall be applied by Valvoline to the
18       oldest portion of Buyer's account.  Late payments shall be subject to
         a late payment charge established from time to time by Valvoline.
19
         c.  If Buyer fails to make any payment when due hereunder, or if
20       Valvoline decides, in its sole opinion, that the credit of Buyer is
         unsatisfactory, Valvoline shall have the right (i) to require payment in
21       cash on each delivery, or (ii) to discontinue further deliveries until all
         due payments have been received or until Buyer's credit becomes
22       satisfactory, or (iii) in the case of any failure of Buyer to meet its
         purchase obligations or to make any payment when due hereunder or
23       any other indebtedness owed to Valvoline, to terminate this

24

25        [5]The parties have both cited to California law in their briefs with no mention of
     the choice of law provision in the Renewal License Agreement; the Licensing Supply
26   Agreement; and the We Feature Agreement with a choice of law provision of Kentucky
     and the effect of the Amendment to License Agreement Required by the State of
27   California in the Renewal License Agreement and the Licensing Supply Agreement.
     Therefore, the Court concludes the parties have waived any argument that Kentucky
28   law should apply to the legal analysis in these motions.  See Lau v. Silva, No. Civ. S-
     04-2351 WBS PAN (GGH)PS, 2006 WL 2382266, at *3 (E.D. Cal. Aug. 17, 2006).

Agreement; provided that nothing in this agreement shall be deemed to limit or otherwise restrict any right, power or remedy of Valvoline.

(Dkt. No. 88, McKeown Decl., Ex. A, Licensee Supply Agreement §§ 3(b), (c).)

Sections 12(b), (c), (g) under DEFAULT AND TERMINATION provision provides:

b. If any payment due hereunder is unpaid when due and remains unpaid for ten (10) days after written notice from Valvoline to Buyer; or

c. If Buyer defaults in the performance of or breaches any other provision of this Agreement and does not cure the same within ten (10) days after oral or written notice of such default or breach; or . . .

g. If Buyer breaches or defaults under any license agreement, lease agreement or other agreement pursuant to which Buyer possesses or operates the Center; then at any time while such event continues, Valvoline may take such actions permitted by this agreement, at law or in equity, which may include terminating this agreement by giving written notice to Buyer specifying a date on which such notice shall become effective and on such date this agreement shall terminate and all rights of Buyer hereunder shall cease. Nothing contained herein shall be deemed to limit or otherwise restrict any right, power or remedy of Valvoline. Such rights, powers and remedies shall be cumulative and concurrent, and the exercise of one or more rights, powers or remedies existing under this agreement or now or hereafter existing at law or in equity, shall not preclude the subsequent exercise by Valvoline of any other right, power or remedy.

(Dkt. No. 88, McKeown Decl., Ex. A, Licensee Supply Agreement §§ 12(b), (c), (g).)

The Renewal License Agreement also provides grounds for termination similar to those in the Licensee Supply Agreement. Paragraph 16 DEFAULT AND TERMINATION PROVISION 16.3 provides

16.3. Licensee shall be deemed to be in default and Licensor, at its option, may terminate this Renewal Agreement and all rights granted hereunder, without affording Licensee any opportunity to cure the default, effective immediately upon the giving of written notice to Licensee, upon the occurrence of any of the following events . . . .

(Dkt. No. 88, McKeown Decl., Ex. B, Renewal License Agreement § 16.3.)

Plaintiffs argue that they properly terminated the Renewal License Agreement and the Licensee Supply Agreements on November 30, 2011 when RFG breached the agreements by failing to satisfy the amounts due on the November and December 2010 invoices. (Dkt. No. 87-4, Nolan Decl. ¶¶ 5, 6.) Plaintiffs provided notice to RFG about

1    the default on January 28, 2011 and despite the multiple extensions of time to pay the

2    amounts due during 2011, as of November 30, 2011, the amounts were unpaid. (Id. ¶

3    6.)  Therefore, Plaintiffs argue they are entitled to terminate the agreements.

4        In opposition while Defendant does not dispute the fact that they did not pay in

5    full the amounts due on the November invoice in December 2010, it contends that

6    according to the Agreements, it cured its breach by providing weekly payments towards

7    these invoices.   Defendant asserts that Plaintiffs improperly failed to apply the

8    payments in early 2011 to the arrears and instead applied them to future purchases.

9    According to a chart reflecting amounts paid by RFG during 2011, RFG made weekly

10   payments to Ashland. (Dkt. No. 87-3, Doty Decl, Ex. B; Dkt. No. 93-2, Gong Decl.,

11   Ex. 2.)  From January 12, 2011 through January 25, 2011, weekly payments totaled

12   $140,722.61.   (Id.)  From January 26, 2011 through February 25, 2011, weekly

13   payments totaled $304,605.76. (Id.) Then from February 26 through March 25, 2011,

14   weekly payments totaled $335,868.61. (Id.) Defendant argues that its payments made

15   in January through March 4, 2011, if applying all payments to the oldest invoice as

16   dictated by section 3(b) of the Licensee Supply Agreement, cured the default.

17   Therefore, RFG contends that Plaintiffs improperly terminated the Agreements.

18       In response, Plaintiffs assert that because Defendant's payment terms changed

19   from credit to "pay-in-advance" terms on January 6, 2011, section 3(b)'s application

20   of payments to the oldest invoice did not apply because section 3(b) applied only to

21   credit terms and not "pay-in-advance" terms.   (Dkt. No. 94-1, Doty Decl. ¶ 4.)

22   Therefore, any payments made after January 6, 2011 applied to future purchases.

23       Section 3(b) provides:

24       b. All payments for products due hereunder shall be made to Valvoline
         by Buyer without retention or set off. Credit terms, if any, extended to
25       Buyer shall be those established from time to time by Valvoline in its
         sole discretion.  All payments on account shall be made to Valvoline
26       at the address indicated on Valvoline's invoice.  Such payments shall
         be applied by Valvoline to the oldest portion of Buyer's account.  Late
27       payments shall be subject to a late payment charge established from
         time to time by Valvoline.

28

1   (Dkt. No. 88, McKeown Dec., Ex. A. ¶ 3(b).)   According to the language of the
2   contract, the Court concludes that section 3(b) logically applies to payments on credit
3   terms, not pay-in-advance terms as such terms would not be applicable to the language
4   in Section 3(b).   However, the contract does not provide for a situation where a
5   franchisee transitions from credit terms to pay-in-advance terms and at what point does
6   the application of monies received apply to amounts on credit or to amounts to pay-in-
7   advance.   At the time of the transition, Defendant still had an "account" with Plaintiffs
8   and whether the amounts paid after the transition should apply to the accounts in
9   arrears until paid off or would stop immediately upon a change in the payments terms
10  is not clear.   This raises a question of fact as to whether the alleged default was cured
11  with the payments in January to March 2011.

12       This issue is further complicated by Defendant's argument that the pay-in-
13  advance status was not provided for in the Licensing Supply Agreement.   According
14  to that Agreement, Plaintiffs could only require C.O.D, which is payment at the time
15  of delivery.  Plaintiffs explain that practically, they could not employ C.O.D terms with
16  any franchisee because the product purchased by the franchisee from Plaintiffs is
17  delivered by third-party contractors. (Dkt. No. 94-1, Nolan Decl. ¶ 6.)  Therefore, any
18  franchisees not eligible for credit terms must pay for product ordered before delivery.
19  (Id.) While that may be the practice, the Licensing Supply Agreement does not provide
20  for pay-in-advance terms.   However, RFG was on a pay-on-advance payment plan.
21  RFG had to first wire a payment to Plaintiffs in an amount at least equal to the
22  estimated amount of the product order. (Dkt. No. 93-2, Gong Decl. ¶ 21.)  As such,
23  there is an issue as to whether the payments for pay-in-advance status and its
24  application to future payments was even proper.  This raises a genuine issue of material
25  fact as to whether Plaintiffs performed under the contract.

26       In addition, Defendant presents facts that Plaintiffs did not perform under the
27  Agreements.  For example, VIOCF granted RFG 16 new license agreements in May
28  2010 where VIOCF would provide financial incentives to RFG in the form of $400,000

1   of credits to RFG's supply agreement account for amounts due to Plaintiffs and

2   substantial commitments for funds needed to replace signs and equipment for the new

3   stores. (Dkt. No. 93-2, Gong Decl. ¶ 9.) Defendant alleges that Plaintiffs immediately

4   breached the agreement and refused to provide the promised funds for new signs and

5   RFG had to expend its own funds to install the needs at the new locations. (Id.) These

6   facts raise a genuine issue of material fact as to whether Plaintiffs performed under the

7   Agreements.

8       Plaintiffs have not demonstrated that there are no genuine issues of material

9   fact as to whether Plaintiffs properly terminated the Licensee Supply Agreement and

10  the Renewed License Agreement.  Accordingly, the Court DENIES Plaintiffs' motion

11  for partial summary judgment on their cause of action for declaratory judgment that the

12  Valvoline Group Agreements are terminated.

13  **B.    Declaratory Judgment that the We Feature Agreement is Terminated**

14      Plaintiffs move for summary judgment on the fifth cause of action that they

15  properly terminated the We Feature Agreement on February 8, 2012 when they learned

16  that RFG breached the agreement by purchasing off-brand bulk oil from competitors

17  and by commingling that off-brand product with Valvoline products while

18  misrepresenting the adulterated product to the public as Valvoline oil.  They argue that

19  the fully executed copy of the Agreement reflects the parties' mutual consent and an

20  exchange of valuable consideration.   Counter Defendants also move for summary

21  judgment on the counterclaims alleged against them arguing that since the General

22  Release was a condition to the We Feature Agreement, all claims in the first amended

23  counterclaim must be dismissed as barred by the General Release.  Defendant opposes

24  arguing that an enforceable We Feature contract was never executed because Plaintiffs

25  and Defendant never agreed to all the terms of the agreement.

26      "It is fundamental that without consent of the parties, which must be mutual

27  (Civ. Code, § 1565), no contract can exist (Civ. Code, § 1550). Consent cannot be

28  mutual unless all parties agree upon the same thing in the same sense (Civ.Code, §

1580). Hence, terms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract [citations]; and a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer [citations] . . . . A counteroffer containing a condition different from that in the original offer is a new proposal and, if not accepted by the original offeror, amounts to nothing [citations] . [citations.] 'Where a person offers to do a definite thing and another introduces a new term into the acceptance, his answer is a mere expression of willingness to treat or is a counter proposal, and in neither case is there a contract; if it is a new proposal and it is not accepted it amounts to nothing [citations].'" <u>Apablasa v. Merritt & Co.</u>,176 Cal. App. 2d 719, 726 (1959).

Plaintiffs presented an offer to RFG to enter into a We Feature Agreement on November 29, 2011 in the Confirmation of Termination Notice.  (Dkt. No. 88, McKeown Decl., Exs. D, E.)  On December 8, 2011, David Gong, President of RFG, executed the Revised Termination Notice, the We Feature Agreement and the General Release with a word change[6] altering the original proposal which is memorialized in an email sent to Matthew McKeown, Vice President of Franchising of VIOCF, at 1:50 a.m.  (Dkt. No. 93-2, Gong Decl., Ex. 3.)  In that email, Gong wrote, "I made the change and initialed it, so let me know if that is not OK."  (<u>Id.</u>; Dkt. No. 88, McKeown Decl., Ex. D.)  Later, on the same day, McKeown wrote back stating, "Page 1, par 1 is correct. It should read 'longer'.  This is because the debts may not be paid off by the end of three years.  If this is the case, then the term would need to be extended until all debts are paid in full.  Please send a copy without this part changed."  (Dkt. No. 93-2, Gong Decl., Ex. 4.)  In his response, McKeown rejected Gong's change of the word "longer" to "shorter."  Gong states the he did not respond to McKeown's email and

---

[6] The email noted that on page 1 of the We Feature Agreement, the word "longer" should be "shorter".   The original language stated: This agreement commences on December 1st, 2011 . . . and continues for a period of 3 years . . . or the date that Buyer has paid the amounts listed on Exhibit A in full, whichever is ***longer,*** unless earlier terminated pursuant to this agreement."  (Dkt. No. 88, McKeown Decl., Ex. F at 44) (emphasis added).

decided he no longer wanted to operate a We Feature Agreement and would challenge the purported termination of the license agreement. (Dkt. No. 93-2, Gong Decl. ¶ 32.)

Over a week later, without discussion with RFG,[7] Gong stated he received Plaintiffs' signature on an executed We Feature Agreement with his change to the terms of the agreement around December 14, 2011. (Dkt. No. 93-2, Gong Decl. ¶ 35.) Then, in an email dated December 16, 2011, McKeown wrote:

> Our current position is that we have a We Feature Agreement. . . . Finally as to the change you made to Section 1 (changing "longer" to "shorter") the risk for VIOC is that you get to 3 years and have not paid off all debts, we could be left in a position where you have fulfilled the term, have paid the receivable balance, but not the other balances, which would remain at risk for us. Therefore, we need to leave the language as to the "longer of" so that if you get to 3 years and have not paid the balances off, that you will need to continue as a "We Feature" until all balances are paid off. As you know we have signed the copy you sent. However, I would prefer a copy of the original with the "shorter" modification changed. Please send along the original signed copy.

(Dkt. No. 93-2, Gong Decl., Ex. 5.) It does not appear that RFG made the requested change.

Here, the email exchanges demonstrate that there was no meeting of the mind as to all terms of the We Feature Agreement. The parties disputed whether the term "longer" or "shorter" should apply to page 1 in paragraph 1. While there were offers, counteroffers and rejections, in the end, there was no mutual consent on the language of "longer" or "shorter." Accordingly, since there is a genuine issue of material fact as to whether there was an enforceable We Feature Agreement, the Court concludes Plaintiffs have not demonstrated a lack of a genuine issue of material fact on whether the We Feature Agreement was properly terminated. As such, there is also a genuine issue of material fact as to whether the General Release that was a condition to the We Feature agreement is enforceable. Accordingly, the Court DENIES Plaintiffs' motion

---

[7]Interestingly, while Gong states that he had no further discussion on the We Feature Agreement, on December 13, 2011, Gong wrote an email about the We Feature contract indicating that the parties were still negotiating the language of the Agreement. (Dkt. No. 93-2, Gong Decl., Ex. 5.)

12cv2079-GPC-KSC

for summary judgment on the fifth cause of action and DENIES Counter Defendants VIOCF, Ashland and ALIP's motion for summary judgment on the counter claims against them in the first amended counterclaim.

**C.   Evidentiary Objections**

Plaintiffs filed evidentiary objections to declarations of David Gong and Amy Lea. (Dkt .No. 94-2.) The Court notes their objections. To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence. To the extent that the evidence is not proper, the Court did not consider it.

**Conclusion**

Based on the above, the Court DENIES Plaintiffs VIOCF and Ashland's motion for partial summary judgment on the declaratory judgment causes of action as to counts five and six in the first amended complaint and DENIES Counter Defendants VIOCF, Ashland and ALIP's motion for summary judgment on claims against them in RFG's first amended counterclaim. The hearing date set for June 6, 2014 shall be **vacated**.

IT IS SO ORDERED.


DATED:  June 4, 2014

HON. GONZALO P. CURIEL
United States District Judge